IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 5, 2018 Session

## LETERPA MOSLEY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 10-00509       James C. Beasley, Jr., Judge**

_____

### No. W2017-01879-CCA-R3-HC
_____

The Petitioner, Leterpa Mosley, along with two co-defendants, was convicted of first degree premeditated murder, felony murder, and especially aggravated robbery. The trial court imposed an effective sentence of life in the Tennessee Department of Correction. On appeal, this court affirmed the Petitioner's convictions and sentences. *See State v. Charles McClain*, No. W2013-00328-CCA-R3-CD, 2014 WL 4754531, (Tenn. Crim. App., Jackson, Sept. 24, 2014), *perm. app. denied* (Tenn. Jan. 15, 2015). The Petitioner filed a *pro se* petition for post-conviction relief and, after appointment of counsel, filed amended petitions alleging ineffective assistance of counsel and violation of his due process rights. Additionally, the Petitioner filed a petition for writ of habeas corpus, claiming the trial court lacked jurisdiction to sentence him and a petition for writ of error coram nobis, claiming newly discovered evidence in the form of an exculpatory letter written by a trial witness. After hearings, the post-conviction court denied the petitions. After review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Terrell L. Tooten, Cordova, Tennessee, for the appellant, Leterpa Mosley.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Michael R. McCusker, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

The Petitioner and his two co-defendants were charged with the murder of Tederrial Hancock, a University of Memphis student, who was shot inside his car outside the Hollywood Public Library on November 11, 2009. At trial, the Petitioner was convicted of first degree premeditated murder, felony murder, and especially aggravated robbery. The trial court merged the murder convictions and imposed an effective sentence of life in the Tennessee Department of Correction. This court affirmed the Petitioner's convictions and sentences. *McClain*, 2014 WL 4754531, at *1.

On October 2, 2015, the Petitioner filed a *pro se* petition for post-conviction relief, alleging ineffective assistance of counsel. The post-conviction court appointed an attorney, who filed amended petitions that maintained the ineffective assistance of counsel claim and also alleged that the Petitioner's due process rights had been violated at a juvenile court transfer hearing. The Petitioner also filed a petition for a writ of habeas corpus and a petition for writ of error coram nobis. The habeas corpus petition asserted that the trial court lacked jurisdiction to sentence the Petitioner due to the improper transfer from juvenile court to criminal court. The writ of error coram nobis petition alleged that a trial witness had written a letter establishing that the Petitioner was innocent, constituting newly discovered evidence that would have resulted in a different outcome at trial. The post-conviction court held hearings on all of the petitions.

## A. Writ of Error Coram Nobis Hearing

The post-conviction court[1] held a hearing on March 3, 2017, during which the State asserted that the petition for error coram nobis was not timely filed and that the alleged newly discovered evidence was available at the time of trial and would not have changed the outcome at trial. The Petitioner conceded that the petition was not timely filed but asked the post-conviction court to toll the statute of limitations. The Petitioner asserted that a State witness at trial, Quintel Stubbs, had sent an exculpatory letter to the Petitioner's sister on September 28, 2015. As such, the letter was "newly discovered evidence" of the Petitioner's innocence. At the hearing, the Petitioner presented Mr. Stubbs, who was also charged in the indictment in the underlying case. This court, in the opinion on direct appeal, summarized Mr. Stubbs's trial testimony as follows:

> Stubbs testified that he had been coming from the Hollywood Public Library earlier that day when he saw Charles McClain. McClain told Stubbs that he and [the Petitioner] were planning to rob Hancock because,

---

[1] The trial court addressed the Petitioner's petition for post-conviction relief, petition for writ of habeas corpus, and petition for writ of error coram nobis; thus, the court below acted in various capacities depending on the particular petition. To avoid confusion, we will refer to as the lower court as "the post-conviction court throughout the opinion.

- 2 -

McClain said, Hancock had robbed one of McClain's friends. McClain told Stubbs that Hancock "kept a whole lot of money on him." McClain told Stubbs that [the Petitioner] was going to rob Hancock, and McClain was going to kill him. McClain showed Stubbs the gun he was carrying. McClain and Stubbs exchanged phone numbers, and Stubbs told McClain "to be careful."

Later that day, McClain called Stubbs and told him to meet him and [the Petitioner]. McClain said that Hancock would be at the library, and they were going to rob him. They went to the area of the library where McClain expected Hancock to be, but Hancock was not there. Stubbs then went home and fell asleep. When he woke up, he called Lavino "Vino" Horne, and they went to "Hollywood." At around 8:30 p.m., McClain called Stubbs again and told Stubbs and Horne to meet McClain and [the Petitioner] at the library.

Stubbs and Horne met up with McClain and [the Petitioner] across the street from the library. McClain told them that [ ] Hancock was at the library, but he "couldn't go up there because if [Hancock saw McClain's] face he's going to know what's up." McClain gave the gun to Horne. Stubbs, Horne, and [the Petitioner] then proceeded to walk towards the library. They did not see Hancock's car at the library, so Stubbs texted McClain. McClain texted Stubbs that Hancock's car was on the other side of the library. Stubbs, Horne, and [the Petitioner] walked around the library. They approached Hancock's car and spoke to him. [The Petitioner] asked to use Hancock's phone. Stubbs testified that he walked away, and he heard gunshots. He looked back and saw Horne and [the Petitioner] running away from the car, and he began to run. A video surveillance recording from the library was presented at trial, in which Stubbs identified Horne walking behind him and [the Petitioner] towards the victim's car.

*McClain*, 2014 WL 4754531 at *1.

At the coram nobis hearing, Mr. Stubbs identified a letter that he sent to the Petitioner's sister on September 28, 2015. Mr. Stubbs said that, before mailing this letter, he had not had any communication with the Petitioner.

Mr. Stubbs testified about the night of the murder, saying that when leaving the Hollywood Library he saw Charles McClain, the Petitioner's co-defendant. Mr. McClain told Mr. Stubbs that he and the Petitioner had a plan to rob Tederrial Hancock as revenge

- 3 -

for another robbery. Later, Mr. Stubbs and his friend Levino Horne met Mr. McClain and the Petitioner, and they walked to the library together. As they prepared to rob Mr. Hancock outside the library, Mr. McClain said that he could not approach Mr. Hancock's car because Mr. Hancock would recognize him. Consequently, Mr. Stubbs, Mr. Horne, and the Petitioner walked toward the car, when, according to Mr. Stubbs, the Petitioner disappeared. Mr. Stubbs recalled that he approached the car and asked Mr. Hancock to use his phone. As he walked away with Mr. Hancock's phone, he heard gunshots and, in response, began running. When he looked behind him, he saw the Petitioner and Mr. Horne behind him. When asked by the post-conviction court, Mr. Stubbs said that there were only two people, he and Mr. Horne, walking in the library's parking lot just before the shooting. When the post-conviction court asked Mr. Horne why there were three people on the surveillance video footage, Mr. Stubbs responded, "You probably got three, but it's only two that went to [Mr. Hancock's] car."

Mr. Stubbs testified that he was sixteen years old at the time police interviewed him about the shooting. He said that he told the police that the Petitioner did not "pull the trigger," but they did not believe him. He recalled that he grew tired of arguing with the police and "just started saying yes." Mr. Stubbs said that he tried to tell the prosecutors that he did not want to testify against the Petitioner because the Petitioner "got a son and everything" and the Petitioner was "innocent." The prosecutors, however, threatened "you better do it or you going to get life too."

Upon questioning by the post-conviction court, Mr. Stubbs agreed that he originally said Mr. McClain fired the gun, then he said the Petitioner fired the gun, and then, the weekend before trial, he said that Mr. Horne fired the gun. Mr. Stubbs agreed that at trial he testified that Mr. Horne fired the gun, and the Petitioner did not fire the gun. About the Petitioner's innocence, Mr. Stubbs testified:

> Like, he was innocent all the way through. Like that's what he was telling me on the phone, and the whole time we've been locked up. And I been telling him I know the same thing. I been telling him that I been trying to tell detectives, the prosecutor, everybody and he didn't believe me. He like, man, you know that I didn't do it.

On cross-examination, Mr. Stubbs agreed that at trial he testified about the "different stories" he told during the investigation. He further agreed that the defendants' attorneys cross-examined him about the inconsistencies in his identification of the shooter. Mr. Stubbs recalled that, during the Petitioner's trial, "it c[a]me out that prior to trial [he] had written a letter to [the Petitioner] in jail apologizing for putting him as the shooter." Mr. Stubbs denied knowing that the Petitioner had admitted to being present

- 4 -

when Mr. Hancock was shot.  Mr. Stubbs read aloud the letter he sent to the Petitioner's sister:

> What's up, G?  I got your address from an understanding individual, but before you begin to feel some type of way just hear me out, if you would.  I know a lot of people got s**t to say about me and the situation.  I feel I should have the chance to speak of -- speak on myself as an uneducated, naive to the system, 16 -year-old kid, I didn't make the best decisions.  Hopefully this letter can bring understanding and the chance to right or wrong to the best of my ability.
>
> S**t we never be pure and innocent again, but I consider myself a man, so I got to be true to myself.  Your brother is an innocent man.  By me knowing that cause pain -- cause pain knowing that eyes and mind open to a lot of s**t.  To be honest, I didn't even think of what I said.  The detectives put all this s**t together.  I guess that's why [Mr. Horne] said the same s**t.  S**t I just – s**t I didn't want to go down for something I didn't do, and when they was telling me how people was saying I did it and was telling me they know what really happened, s**t, I was looking at -- at them like they was dumb.
>
> But it was on me, because my dumba** went along with whatever they felt sounded was right.  Me doing time for a murder I didn't commit ain't right, but your brother doing time for some -- for some s**t he wasn't even involved in, that s**t all the way wrong.  So just know that I do recognize my wrongdoing and take responsibility for whatever I do.  So if I'm needed in any way, I'm here.  If it's all the -- all the way f**ked me, s**t I understand and accept that too.  This letter ain't meant for no weak a** acceptance or approval.  I done forgave myself for all my faults.  S**t, that's the – that's the hardest s**t I ever did, believe it or not.
>
> Ain't s**t bigger than me.  So anything else I can deal with with my eyes closed. P.S. I don't want to write or say too much right now, because I don't know if my words going to be heard or not.  It's a lot more that I would love to get off my chest though, but if I get the chance to or not, it is what it is.  It's still love.

On redirect examination, Mr. Stubbs confirmed that he did not "attempt to reach out to" the Petitioner until after he wrote the letter.

Upon questioning by the court, Mr. Stubbs agreed that he testified at trial about his identification of all three of his co-defendants as shooters and was cross-examined about the changes in his statements about the identity of the shooter. He reiterated that, at the Petitioner's trial, he testified that Mr. Horne was the shooter and identified Horne and the Petitioner on the surveillance footage. He said that the Petitioner did not know there was going to be a robbery

After hearing the evidence, the post-conviction court made the following findings:

> First of all, the trial transcript should reflect that Mr. Stubbs did indicate that he wrote a letter to [the Petitioner] before the trial and did indicate that he apologized for putting him as the shooter. That is in the trial -- would be in the trial transcript, because it's in my notes. So I'm assuming it's in the transcript or I wouldn't have written it down.
>
> Also, the trial transcript should reflect that [the Petitioner] put himself on the scene by making the statement to the police that he was with some other people when the guy got shot, and at that point, the -- there was no formal statement taken, because at that point, [the Petitioner]'s sister said I think we need to get a lawyer, and they stopped the questioning. So [the Petitioner] had put himself on the scene at the time the man was shot.
>
> The record should also reflect that there are multiple phone records indicating that there was communications between Mr. Stubbs and [the Petitioner], [the Petitioner] and Mr. McClain, Mr. Stubbs and Mr. McClain, . . . and the trial was not strictly based on Mr. Stubbs' identification of a video, which showed [the Petitioner], Mr. Horne, and Mr. Stubbs walking through the parking lot going to the scene and running from the parking lot after the scene.
>
> There were phone records that linked all three of them together. There were phone records that linked them with Mr. McClain. There were phone records that linked all of them to the victim at the time and/or the immediate time of the shooting. The only thing that we have different today is that now Mr. Stubbs says not only was [the Petitioner] not the shooter, but he wasn't even on the scene at the time of the shooting. And that is not consistent with anything that was presented in the trial.

And I will say for the record that my recollection of this trial, and the transcript will speak for itself, . . . that . . . this case was unique in that . . . we fought long and hard before we went to trial about a lot of issues, including motions to suppress, some extensive and interesting motions to suppress by everybody involved in this case, and that Mr. Horne and Mr. Stubbs were separated from [the Petitioner] and Mr. McClain almost from the beginning, because they were going to be witnesses for the State against [the Petitioner] and Mr. McClain.

They had put it on [the Petitioner] as being the shooter, and the weekend before the first trial was scheduled to begin, [the Petitioner] and Mr. McClain were going to start trial, and Mr. Horne and Mr. Stubbs were going to be witnesses. They were brought down to be interviewed, and the police department overheard them talking between the walls. And Mr. Stubbs to his credit was telling Mr. Horne, who as he says is like a brother to him, "we can't do this. This is not right. We can't put this on [the Petitioner]. He was not the shooter. You need to tell them what happened. You need to tell them, you know, what you did."

And at that point, that information was relayed. We had to reschedule the trial, because Mr. Horne went from being a witness for the State to being the shooter. And in the course of the trial, Mr. Stubbs came in and said, yes, I originally put it on [the Petitioner], because I didn't want to put it on Mr. Horne, because he's my brother. And finally, my conscience bothered me enough that I said, I can't do this. And Mr. Horne was the shooter. And he identified everybody involved. He identified all the parties involved.

The proof was consistent with all of the testimony that was given by Mr. Stubbs. It was corroborated by all the phone records involved. [The Petitioner] put himself on the scene at the time that the incident occurred. And the jury was able to hear Mr. Stubbs obviously being strenuously cross-examined about his inconsistent statements, his falsehoods, his planning and attempting to put this on [the Petitioner] as the original shooter.

He was cross-examined by everybody, because he obviously at that point had become, you know, the person that all three of the other co-defendants were now attempting to cross-examine. So

there was extensive cross-examination, and Mr. Stubbs . . . was consistent with his statements that everybody was involved in the planning. Everybody was involved to the extent that they were involved.

That was consistent with all of the phone records that were used, the communications that were being conducted, and I think to -- and as I indicated at least per my notes, and I assume it's going to be in a transcript, Mr. Stubbs testified in the trial on cross-examination that he sent a letter to [the Petitioner] apologizing to him for making him the shooter, and that all of the information was available that [Mr. Stubbs] had said, I -- I lied when I said [the Petitioner] was the shooter. And to now allow Mr. Stubbs to come in and say, well, I lied about all these things and then I told the truth. And I squared everything, and I did everything the right way.

And now, I'm going to come back later on and say, oh, but I forgot to say this, which is completely inconsistent with any of the facts, the video in the case, any of the phone records. None of that would be consistent with what he's testifying to. The Court is of the opinion, first of all, that this is not newly discovered evidence, that Mr. Stubbs has been available. He has admitted from early on in this proceeding that he has made false statements against [the Petitioner].

And that the opportunity was there for either him to have said something different or [the Petitioner] or somebody else to attack his credibility at that point or any other point throughout the course of this. So I don't find Mr. Stubbs to be newly discovered evidence. Therefore, I don't find that there is any basis for tolling the running of the statute of limitation.

I don't find that there is a basis for granting the writ of error coram nobis. I find that the statute has run, but if there is some basis to show that the statute should not have run for due process purposes, I find that after listening to the testimony of Mr. Stubbs, it is not newly discovered evidence, and it would not have changed the outcome of the trial based upon all the rest of the proof that was introduced and put on and proved in the trial and the extensive cross-examination of Mr. Stubbs by [the Petitioner]'s attorney and every other attorney involved in the case.

- 8 -

So for those reasons, I'm going to rule that the writ of error coram nobis is not well-taken and should be denied.

## B. Post-Conviction Hearing

The post-conviction court held a hearing on July 20, 2017, during which the parties presented evidence related to the Petitioner's petition for post-conviction relief and petition for habeas corpus. The Petitioner's claims, maintained on appeal, related to a transfer hearing in juvenile court. The Petitioner argued that his attorney at the transfer hearing and his trial attorney ("Counsel") were ineffective for failing to object to and/or appeal the improperly conducted transfer hearing in juvenile court. The Petitioner also argued that the transfer hearing was so unfair and faulty as to violate his right to due process. Finally, as it relates to his habeas claims, the Petitioner asserted that because the transfer was invalid, the criminal court had no authority over the Petitioner.

At the hearing, Counsel testified that he represented the Petitioner at trial and on direct appeal; however, he did not represent the Petitioner in juvenile court before the transfer. Counsel said that he received discovery in the case, but it did not include any discovery related to the transfer hearing. The Petitioner's family expressed concern about the sufficiency of the evidence presented at the transfer hearing and whether enough witnesses had been called. Based upon their concern, Counsel requested a recording of the transfer hearing but did not receive it.

On cross-examination, Counsel testified that it was "very common practice" for a magistrate to sit as a special judge in juvenile court. Counsel said that he believed the family's concern about the transfer hearing related only to the evidence presented and not the procedure followed at the transfer hearing. He affirmed that, had he believed the transfer hearing had been improper, he would have challenged it. Counsel agreed that he never filed a motion to suppress the Petitioner's confession. He explained that he did not do so because the Petitioner never made a confession. He recalled that the Petitioner met with the police, made a statement placing him at the scene at the time of the shooting, but he denied any participation in the shooting. His adult sister then intervened, saying he would not make any further statements without an attorney. Counsel said that there was no "good faith basis to even allege" the statement should be suppressed and the Petitioner denied culpability.

Counsel testified that even if the trial court had suppressed the statement, there was sufficient evidence for the State to proceed with prosecution of the Petitioner.

After hearing the evidence, the post-conviction court issued two separate written orders: one addressing the post-conviction claims and the other addressing the habeas corpus claim. The court made the following findings as to the post-conviction claims:

The petitioner alleges that counsel at the Juvenile Court Transfer hearing was ineffective for failing to challenge the status of the Special Judge hearing the proceeding. He further alleges that trial counsel, a different attorney, was ineffective for not appealing the same issue to the Criminal Court or on appeal of the conviction. The burden is on the petitioner to prove by clear and convincing evidence that counsel's performance was deficient and that the deficiency prejudiced the defense and that as a result, but for said deficiencies, the trial proceedings would have been different. Magistrate Herb Lane conducted the hearing in Juvenile Court. Herb Lane is a licensed attorney in the State of Tennessee and is and was in good standing with the Board of Professional Responsibility. The elected Judge of Juvenile Court at the time was the Honorable Curtis Person who in compliance with state law appointed Mr. Lane as a Magistrate and a Special Judge to hear this case. The only allegation made is to the actual form used by the Juvenile Court to designate the Special Judge. The petitioner argues that the form is deficient in its specifics as to the actual proceeding of naming the Special Judge. In fact the form has been approved and upheld and has been in effect for many years in Shelby County. Further, Herb Lane has served both as a Magistrate and a Special Judge in Shelby County Juvenile Court for many years. There was nothing about the technical proceeding which would cause any attorney practicing in those courts to object to or appeal the technical format for the proceeding. Petitioner has failed to show that "but for" such an objection to the form and format the petitioner would not have been remanded to Criminal Court. No proof has been offered that had Judge Person actually heard the proceeding the ruling would have been any different; specifically the petitioner met the requirements for transfer to Criminal Court. A review of the transcript and the records from Juvenile Court indicate that there were reasonable grounds to believe that the petitioner committed the delinquent act; that he was not committable to an institution for the developmentally disabled or mentally ill; and that the interests of the community required that the petitioner be put under legal restraint or discipline, all in compliance with the statutes regulating juvenile offenders. The petitioner's due process rights were protected and since all elements for transfer were met, the law required that the child should be treated as an adult and the case was properly transferred to Criminal Court. This court finds that there is no basis for objection by Juvenile Court counsel, Criminal Court trial counsel or appellate counsel to

the format or the proceedings in Juvenile Court. Therefore there is no basis for an allegation of ineffective assistance of counsel for not objecting to said format or proceedings.

In a separate order, the post-conviction court denied the Petitioner's habeas corpus claim, finding:

Petitioner's only argument is that the form is vague and does not properly identify the judicial parties and their jurisdiction over the issues in question. This court will admit that the language used is poorly drawn. However, the burden is on the petitioner to prove that the proceedings were void.

Judge Curtis Person was the duly elected Judge of Juvenile Court at the time of the proceeding. T.C.A. 17-2-122(b) state[d]:

"Where a judge finds it necessary to be absent from holding court and appoints as special judge: A full time officer of the judicial system under the judge's supervision whose duty it is to perform judicial functions, such as a juvenile magistrate, a child support magistrate or clerk and master, who is a licensed attorney in good standing with the Tennessee Supreme Court. The judicial officer shall only serve as a special judge in matters related to that officer's duties as a judicial officer."

Judge Person had previously appointed Herbert Lane as a Magistrate of the Juvenile Court of Shelby County and as such he was designated as a Special Judge to hear this case. Mr. Lane sat regularly as a Special Judge under the authority of Tennessee law. He was a licensed attorney in the State of Tennessee and was in good standing. This procedure and form were used in the common and normal course of business at the Juvenile Court. Special Judge Lane had presided over many cases in that capacity over the years. There was no legal basis cited to object to the procedure, the form or the Special Judge. The petitioner was represented by counsel at the time of the hearing and there was no objection voiced nor was there any appeal or contest of the Juvenile or Criminal Court's jurisdiction at the time.

This court finds that the form used, although poorly worded, was proper and that it gave proper notice to the petitioner that a Special Judge would hear the case. Further, this court finds that the Special Judge was

duly appointed by the elected Judge to fill the role as Special Judge under the laws of the State of Tennessee and that the Special Judge met the statutory requirements to hold that position. Finally, the court finds that the procedure and form have been used and affirmed by case law as sufficient to satisfy the laws of the State of Tennessee.

Therefore, the court finds that the Special Judge had the authority to make the findings of fact and recommendations to transfer the petitioner to Criminal Court and thereby conferred upon Criminal Court the jurisdiction to try the petitioner as an adult. With the proper jurisdiction to hear the petitioner's case in Criminal Court, the judgment imposed restraining the petitioner of his liberty is valid and is not void.

It is from these judgments that the Petitioner appeals.

## II. Analysis

On appeal, the Petitioner maintains that he received the ineffective assistance of counsel because his attorney failed to challenge the transfer of his case from juvenile court to criminal court and that the improper juvenile transfer hearing violated his due process rights. As to his habeas claim, he argues that the criminal court lacked jurisdiction due to the improper transfer from juvenile court. He further asserts that he is entitled to error coram nobis relief based upon Mr. Stubbs's September 2015 letter.

## A. Post-Conviction Relief

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

# 1. Ineffective Assistance of Counsel

The Petitioner asserts that because "the Transfer Hearing does not appear to have been conducted properly," the post-conviction court erred when it denied his ineffective assistance of counsel claim. He claims that the transfer order is vague in that it refers to the "Judge" rather than the juvenile court judge's full name, when appointing Herbert Lane as special judge, resulting in no proper appointment of a special judge. He faults his attorney during the juvenile court transfer hearing for failing to object to the Special Judge, and he faults Counsel for failing to appeal the transfer. The State responds that the Petitioner has failed to prove this allegation by clear and convincing evidence and asks this Court to affirm the post-conviction court's denial.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting Goad, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

The Petitioner asserts that his attorneys were ineffective for failing to challenge the appointment of the special judge. The order is included in the record and states:

> The Judge finds it necessary to be absent from holding Court, and pursuant to T.C.A. 37-1-122(b) appoints as substitute judge, Herbert J. Lane, who is a licensed attorney in good standing with the Tennessee Supreme Court and a Magistrate appointed by him to serve as special judge in matters related to duties as a judicial officer.

We agree with the post-conviction court that the form is poorly drafted and cites an incorrect statute. The relevant statute is Tennessee Code Annotated section 17-2-122 (2009):

> [W]here a judge finds it necessary to be absent from holding court and appoints as substitute judge an officer of the judicial system under the judge's supervision whose duty it is to perform judicial functions, such as a juvenile magistrate, a child support magistrate or clerk and master, who is a licensed attorney in good standing with the Tennessee supreme court. The judicial officer shall only serve as special judge in matters related to that officer's duties as judicial officer.

The record supports the post-conviction court's finding that Herbert Lane, a licensed attorney in good standing, was a magistrate qualified under the law to sit as Special Judge. Therefore, the Petitioner has not shown by clear and convincing evidence that either his juvenile court attorney or Counsel were ineffective for failing to challenge Magistrate Lane presiding over the transfer hearing. Moreover, the Petitioner has failed to show that, had Juvenile Court Judge Curtis Person presided over the hearing, the transfer to criminal court would have been denied. Accordingly, we conclude that the Petitioner has failed to show that either attorney was ineffective in this regard. The Petitioner is not entitled to relief.

## 2. Due Process

The Petitioner asserts that the Petitioner's due process rights were violated when the State "with[e]ld" the "Transfer Hearing" from Counsel, preventing the Petitioner the opportunity to appeal the improper hearing. He maintains that the faulty transfer order contributed to the improper hearing and additionally, that the Petitioner's rights were never reviewed with him and that the juvenile court did not find probable cause. The State responds that the Petitioner has waived his due process claim because he failed to raise it at the trial court or on direct appeal.

The record establishes that the Petitioner did not present this issue to the trial court or upon direct appeal as a stand alone claim. We therefore agree with the State that the Petitioner waived this due process claim. *See* T.C.A. § 40-30-106(g).

Notwithstanding the waiver, the written findings of the special judge indicate that the factors contemplated in Tennessee Code Annotated section 37-1-135(a)(4) were considered and that the special judge found probable cause to transfer the Petitioner's case. Further, the Petitioner failed to present evidence that the State had "an obligation to turn over the Transfer Hearing" to Counsel, that the State possessed the transfer hearing

audio at the time, or that the copy of the hearing was "material." *See* Tenn. R. Crim. P. 16(a)(1)(F)(i).

## B. Habeas Corpus Claim

The Petitioner asserts that it is "clear" that the order transferring the Petitioner's case to criminal court "is invalid and improper on its face;" therefore, depriving the criminal court of the authority to detain the Petitioner. He argues that because the judge who appointed Herbert Lane as the special judge is not specifically named, the authority to preside over the hearing was not conferred. The State responds that the Petitioner has failed to establish that his judgment is void or that his sentences have expired, thus, the post-conviction court properly denied relief. We agree with the State.

Article I, section 15 of the Tennessee Constitution guarantees the right to seek habeas corpus relief. *See Faulkner v. State*, 226 S.W.3d 358, 361 (Tenn. 2007). Although the right is guaranteed in the Tennessee Constitution, the right is governed by statute. T.C.A. §§ 29-21-101, -130 (2014). The determination of whether habeas corpus relief should be granted is a question of law and is accordingly given *de novo* review with no presumption of correctness given to the findings and conclusions of the court below. *Smith v. Lewis*, 202 S.W.3d 124, 127 (Tenn. 2006) (citation omitted); *Hart v. State*, 21 S.W.3d 901, 903 (Tenn. 2000). The grounds upon which habeas corpus relief can be granted are very narrow. *Taylor v. State*, 995 S.W.2d 78, 83 (Tenn. 1999). The grounds upon which a habeas corpus petition can be based are as follows: (1) a claim that there was a void judgment which was facially invalid because the convicting court was without jurisdiction or authority to sentence the defendant; or (2) a claim that the defendant's sentence has expired. *Stephenson v. Carlton*, 28 S.W.3d 910, 911 (Tenn. 2000) (citing *Archer v. State*, 851 S.W.2d 157, 164 (Tenn. 1993)). "An illegal sentence, one whose imposition directly contravenes a statute, is considered void and may be set aside at any time." *May v. Carlton*, 245 S.W.3d 340, 344 (Tenn. 2008) (citing *State v. Burkhart*, 566 S.W.2d 871, 873 (Tenn. 1978)). In contrast, a voidable judgment or sentence is "one which is facially valid and requires the introduction of proof beyond the face of the record or judgment to establish its invalidity." *Taylor*, 995 S.W.2d at 83 (citations omitted); *see State v. Ritchie*, 20 S.W.3d 624, 633 (Tenn. 2000).

The petitioner bears the burden of showing, by a preponderance of the evidence, that the conviction is void or that the prison term has expired. *Wyatt v. State*, 24 S.W.3d 319, 322 (Tenn. 2000). Furthermore, the procedural requirements for habeas corpus relief are mandatory and must be scrupulously followed. *Archer*, 851 S.W.2d at 165.

We have already concluded that the transfer order was in compliance with applicable statutes. Even so, as the State correctly notes, the Tennessee Supreme Court

has held that "the absence of a transfer order cannot be said to affect the [criminal] court's subject matter jurisdiction, which, in a real sense, is concurrent with that of the juvenile court as to certain offenses committed by children falling within a specified age span." *Sawyers v. State*, 814 S.W.2d 725, 729 (Tenn. 1991) (citations omitted). Accordingly, we cannot conclude that, even if any defects in the transfer proceeding were proven, any such defect would affect the criminal court's subject matter jurisdiction with regard to convicting the Petitioner. In the present case, the juvenile court's transfer order reflects a complete adjudication of the transfer issue. Thus, the claimed defect does not appear on the face of the record and, therefore, cannot give rise to habeas corpus relief. *See Andrew Levi Jefferson v. State*, M2002-01604-CCA-R3-PC, 2003 WL 22937778, at *12 (Tenn. Crim. App., at Jackson, Dec. 12, 2003), *perm app. denied* (Mar. 22, 2004).

Accordingly, the Petitioner is not entitled to relief as to this issue.

## C. Writ of Error Coram Nobis

The Petitioner asserts that Mr. Stubbs's testimony is newly discovered evidence and would have changed the outcome of the trial. The State maintains that the post-conviction court correctly determined that Mr. Stubbs's testimony did not constitute newly discovered evidence that would have changed the outcome at trial and that the post-conviction court correctly dismissed the Petitioner's claim as untimely because the evidence existed during the limitations period. We agree with the State.

Tennessee Code Annotated section 40-26-105 (2012) provides:

> There is hereby made available to convicted defendants in criminal cases a proceeding in the nature of a writ of error coram nobis, to be governed by the same rules and procedure applicable to the writ of error coram nobis in civil cases, except insofar as inconsistent herewith. . . . Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which are litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at trial.

It is well-established that the writ of error coram nobis "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999). Generally, a decision whether to grant a writ rests within the sound discretion of the coram nobis court. *See State v. Hart*, 991 S.W.2d 371, 375 (Tenn. Crim. App. 1995). We, therefore, review for abuse of discretion. *See State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002).

- 17 -

A petition for a writ of error coram nobis must be filed within one year of the judgment becoming final in the trial court. T.C.A. § 27-7-103. This statute of limitations "is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed post-trial motion." *Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010); *see Mixon*, 983 S.W.2d at 670 ("[W]e reject the contention . . . that the statute does not begin to run until the conclusion of the appeal as of right proceedings."). In the present case, the judgment became final on January 14, 2013.[2] The Petitioner did not file this petition for writ of error coram nobis until July 15, 2016, more than three years later.

The one-year statute of limitations for a petition for writ of error coram nobis may be tolled on due process grounds if a petition seeks relief based upon newly discovered evidence of actual innocence. *Harris*, 301 S.W.3d at 145. In determining whether the statute should be tolled, the court must balance a petitioner's interest in having a hearing with the State's interest in preventing a claim that is stale and groundless. *Id*. Generally, "before a state may terminate a claim for failure to comply with . . . statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." *Burford v. State*, 845 S.W.2d 204, 208 (Tenn. 1992). The *Burford* rule requires three steps:

> (1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

*Sands v. State*, 903 S.W.2d 299, 301 (Tenn. 1995). As a general rule, the claim at issue must not have existed during the limitations period to trigger due process consideration. *Seals v. State*, 23 S.W.3d 272 (Tenn. 2000). Discovery of or ignorance to the existence of a claim does not create a "later-arising" claim. *See Brown v. State*, 928 S.W.2d 453, 456 (Tenn. Crim. App. 1996); *Passarella v. State*, 891 S.W.2d 619, 635 (Tenn. Crim. App. 1994).

---

[2] The Petitioner included in the record the judgment forms, signed by the trial judge January 4, 2013; however, there is no order denying the motion for new trial. In his petition for writ of error coram nobis, the Petitioner provides that his motion for new trial was denied on January 14, 2013, and he does not contest that the statute of limitations had expired. We rely upon this reference in determining when the statute of limitations began to run.

After reviewing the record, we conclude that the post-conviction court did not abuse its discretion in dismissing the petition as time-barred. The Petitioner submitted a letter, mailed by Mr. Stubbs on September 28, 2015. Even though the letter is dated after the Petitioner's trial, this allegation is not "later-arising" for the purposes of tolling the statute of limitations. The letter is consistent with Mr. Stubbs's trial testimony that the Petitioner was not the shooter. Mr. Stubbs was cross-examined at trial about inconsistencies in his identification of the shooter. Additionally, Mr. Stubbs admitted that he sent the Petitioner a letter before the Petitioner's trial apologizing for naming the Petitioner as the shooter during a period of the investigation. Further, the claims the Petitioner now raises are not cognizable within a petition for writ of error coram nobis. In Tennessee, a writ of error coram nobis should be granted when "subsequently or newly discovered evidence . . . may have resulted in a different judgment, had it been presented at trial." T.C.A. § 40-26-105 (2012); *Workman v. State*, 41 S.W.3d 100, 104 (Tenn. 2001). As the post-conviction court succinctly laid out in its order denying relief, the Petitioner's claims do not raise such evidence. We conclude, therefore, that the post-conviction court properly denied the relief sought by the Petitioner.

Because the Petitioner's claim is not "later-arising," we do not address the third step in the analysis, namely the reasonableness of the delay. *See Sands*, 903 S.W.2d at 301. The Petitioner has failed to demonstrate that the statute of limitations should be tolled in his case; therefore, we conclude that the post-conviction court properly dismissed his untimely petition for coram nobis relief. *See id*. The Petitioner is not entitled to relief.

### III. Conclusion

Based upon the foregoing, we affirm the post-conviction court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

- 19 -